CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
for Harrisonburg
FILED
OCT 0 6 2006
JOHN F. CORCORAN, CLERK
BY: Nicole
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## HARRISONBURG DIVISION

|  |  |
|---|---|
| ) | Civil Action No. 5:05CV00047 |
| ) | (Member case: 5:05CV00052) |
| ) |  |
| IN RE TREX COMPANY, INC. ) | **MEMORANDUM OPINION** |
| SECURITIES LITIGATION ) |  |
| ) | By: Hon. Glen E. Conrad |
| ) | United States District Judge |
| ) |  |

Plaintiffs have filed this class action shareholder suit, alleging securities fraud against the

defendants, Trex, Inc. and two of its chief officers. The court has jurisdiction over the subject

matter of this action pursuant to Section 27 of the Act, 15 U.S.C. §78aa, and 28 U.S.C. § 1331

and § 1337. The putative class includes those who purchased Trex stock from October 25, 2004

to June 22, 2005. The plaintiffs allege that Trex Company, Inc. ("Trex" or "the company") and

individual defendants Robert G. Matheny ("Matheny"), the company's Chairman and Chief

Executive Officer, and Robert G. Fletcher ("Fletcher"), the company's Chief Financial Officer

and Senior Vice President, made misrepresentations of material facts as to the company's

financial health, which artificially inflated the share price during the class period.

The Consolidated Complaint charges three separate statutory violations. First, the

plaintiffs claim that Trex, Matheny, and Fletcher violated § 10(b) of the Securities Exchange Act

("the Act") of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5. The second

count alleges that Matheny and Fletcher were "control persons" who are liable for the

corporation's fraudulent acts under § 20(a) of the Act, 15 U.S.C. § 78t(a). The final allegation is

that both Matheny and Fletcher engaged in illegal insider trading in contravention of § 20A of the

Act, 15 U.S.C. § 78t-1. The plaintiffs seek to represent all those who were damaged from the purchase of Trex securities during the class period.

Citing various pleading deficiencies in plaintiffs' complaint, defendants have filed a motion to dismiss. The issues have been thoroughly briefed, and argued at a hearing conducted on August 25, 2006. For reasons stated herein, the court concludes that the plaintiffs have not sufficiently alleged the material misstatements or omissions, or the scienter required under the PSLRA.

## FACTUAL AND PROCEDURAL BACKGROUND

Trex is the nation's largest manufacturer of non-wood decking material, which it markets under the brand name "Trex." The company's common stock is traded on the New York Stock Exchange. For the most part, Trex sells its product to wholesale companies who in turn market the product throughout the United States.

Trex was before this court in another securities fraud case in 2002. *In re Trex Co. Inc., Sec. Litig.*, 212 F.Supp. 2d 596 (W.D. Va. 2002) (Wilson, C.J.) ("*Trex I*"). The plaintiffs in that case sought to represent a class consisting of all who purchased Trex shares during the period from early November 2000 until June 18, 2001. They alleged that by November 2000, the two-year-old company and its executives knew that the historic growth the company had enjoyed was coming to an end because of increased competition in the non-wood decking market and decreased demand from its distributors. Plaintiffs alleged that, instead of warning investors of the slow down, the defendants devised a channel-stuffing[1] scheme to ensure year 2000 sales. The

---

[1] The court understands the term "channel stuffing," as used in this case and *Trex I*, to mean "the pulling forward of revenue from future fiscal periods by inducing customers—through price discounts, extended payment terms or other concessions—to submit purchase orders in advance of when they would otherwise do so. Material

2

defendants allegedly did this by offering Trex distributors extraordinary discounts and extended payment periods for products ordered in late 2000. The complaint argued that the individual defendants acted to quell analysts' expressed concerns that the company was not going to meet its fourth-quarter revenue predictions and to ensure that they were on track to make their 2000 year-end executive bonuses. According to the plaintiffs, the defendants failed to disclose the channel stuffing program and its adverse impact on year 2001 sales. The plaintiffs argued that these omissions made the company's public statements during the class period materially misleading. According to the plaintiffs, the omissions caused the value of Trex stock to be artificially inflated until the end of the class period, when Trex disclosed lower than expected second-quarter revenues. *Id.* at 599–600.

The court in *Trex I* found that the plaintiffs did not allege sufficient facts to show that the failure to disclose the channel stuffing program rendered the company's public statements materially misleading. *Id.* at 611. Judge Wilson noted that without "significant specificity," any Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4, claim based on an underlying allegation of improper channel stuffing must fail. *Id.* More to the point, the court faulted the complaint, saying that it offered only conclusory allegations of channel stuffing and did not "identify even one particular transaction involved in defendants' alleged channel stuffing activities, nor provide the court with the amount or percentages of revenues those transactions generated." *Id.* With regard to the plaintiffs' contention that the defendants' allegedly material omissions were either reckless or contrived with the intent to deceive, manipulate, or defraud, the

---

undisclosed channel stuffing may cause a company's reported results of operations to be misleading." *In re Sunbeam Corp.*, S.E.C. Release No. 7976, Admin. File No. 3-10481 (May 15, 2001).

court found that the plaintiffs' allegations regarding the individual defendants' motives were "insufficient to create a strong inference of scienter because they concern[ed] motivations common to all corporate officers." *Id.* at 607 (citation omitted). Likewise, the court found that the plaintiffs did not plead enough information to allege that the defendants should have known that their failure to disclose the channel stuffing program constituted a material omission. *Id.* at 612.

From 2000 to late 2004, the period between *Trex I* and this case, Trex continued attempts to manage the seasonality of its sales, most of which occurred between Memorial Day and Labor Day.[2] To that end, Trex instituted its "Early Buy Program," which provided incentives to encourage distributors to order and receive Trex products during the normally slow first quarter of the year. Some iteration of the plan was in effect as early as first quarter 2001, during the *Trex I* class period. In that quarter's 10-Q filing, Trex credited its "augmented early-buy program which offered extended payment terms for purchases by distributors during the months of January through April" for its strong sales during the quarter. *Id.* at 612 n.16. By the current class period, the Early Buy Program, as it came to be called, was a stated part of Trex's distribution strategy to even out its yearly cycle and minimize the bottlenecks in production, distribution, and sales that occurred during the peak building season. Because Trex recognized revenue when products were shipped, the Early Buy Program also allowed it to even out its revenue cycle during the year and enjoy better first-quarter earnings.

---

[2]In summarizing the facts of this case, the court has focused on the issues implicated by the plaintiffs' complaint, and has construed the facts in the light most favorable to the plaintiffs. *See Chisolm v. TransSouth Fin. Corp.*, 95 F.3d 331, 334 (4th Cir. 1996).

4

During the interim between *Trex I* and this case, the non-wood decking industry expanded significantly. Trex faced greater competition and a declining market share each year. In 2000, the company's SEC filings show that it had 60% of the market-share of the non-wood decking market. In comparison, the plaintiffs assert that by the end of 2004, the company's share had shrunk to around 30%.

The increasing competition in the industry put a strain on Trex's relationship with its dealers. A 2003 survey conducted by the Denneen Group showed that Trex's distributors were dissatisfied with the Early Buy Program. In response, the company began to allow distributors to take delivery of the product as late as April and still have the price benefits of the program. Complaint at ¶57. Apparently, this was not enough to soothe distributors. A Bain & Company strategy solutions report from March 2005 stated that the two-step distribution system the company used had served all parties well when Trex was the "only real branded provider" of composite non-wood decking. The report noted, however, that as increased competition brought new modes of distribution to the market, the company began having difficulty convincing its distributors to invest. The report concluded that stagnation in the company's distribution model and increased competition had left Trex vulnerable and that Trex needed to "expand and revitalize its distribution strategy." Defendants' Exhibit #10 at 4.

On October 25, 2004, Trex issued third-quarter 2004 financial results, showing net sales up over 56% and net income up 39% over third quarter 2003. Matheny attributed the growth to new product lines and the company's new distribution relationship with Home Depot. Despite the seasonality of the company's business and the expected slump in the fourth quarter, he reaffirmed the company's 2004 guidance figures. According to the figures released on that day,

5

the company needed net sales of between $16 and $21 million in the fourth quarter to make its 2004 guidance figures. Those amounts were between 7% and 9% of total net projected sales for the year. Matheny also acknowledged that the company's gross margin was being squeezed by higher manufacturing costs, mostly caused by the increased price of raw materials. At that time, the company issued its 2005 guidance, saying that it expected growth in both revenue and earnings of between 20% and 25%.

During the quarter leading up to and during the instant class period, the price of the company's raw materials did increase significantly. Trex's non-wood composite material is made primarily from polyethylene. Matheny acknowledged in Trex's third-quarter 2004 earnings call that the company's polyethylene costs were up 13% for the quarter, putting a significant squeeze on the company's gross margins. The trend continued during the next few months. During the period from December 2004 to February 2005, the price of polyethylene from the company's primary supplier, Dow, increased 15%. In the earnings call after announcing its fourth-quarter 2004 results, the company stated that it was working to improve its gross margins through increased productivity and modest price increases. By the time the company released its 2004 year-end results, however, it acknowledged that the company's 22% gross profit increase in 2004 was offset in part by the increased price of raw materials and "decrease[s] in production rates due to product quality initiatives and the associated decrease in absorption of fixed manufacturing expenses." As a result, gross profit as a percentage of sales in 2004 was 40.3% as compared with 43.9% in 2003.

To deal with the increased market pressures, Trex also introduced a new advertising campaign, added product lines, increased production, and explored new distribution channels. In

6

2004, the company released three new product lines, completed financing on one new production facility, and began a relationship with Home Depot, its first direct-to-customer distribution. In December 2004, the company introduced a new high-end product design called Brasilia. In its April 2005 earnings call after its first-quarter press release, Matheny stated that the line's introduction "continues to exceed our expectations, and should prove to contribute strongly to this year's performance." Complaint ¶129. The plaintiffs cite evidence, however, that the introduction of this line caused significant production delays and quality control problems, to the extent that Trex had to stop production at one point in March 2005. The company similarly acknowledged in its first-quarter filing with the SEC that its production of new products had caused "operating inefficiencies" and had "negatively affected manufacturing unit costs." Complaint at ¶134.

## THE PLAINTIFFS' ALLEGATIONS

The plaintiffs claim that from October 25, 2004 until June 22, 2005, defendants made misrepresentations of material facts about the company's financial health that artificially inflated the share price. The plaintiffs claim damages resulting from the 29.6% drop in share price that occurred on June 23, 2005, immediately after the company released it preliminary second-quarter 2005 report, disclosing that Trex expected a net loss for the quarter of $0.20 to $0.25 per diluted share. The plaintiffs contrast this net loss for the second quarter with the company's projected 2005 revenue and earnings growth of between 20% and 25%. The plaintiffs allege that they were harmed because they purchased Trex stock at artificially inflated prices during the class period.

The plaintiffs assert that during the class period, the defendants willfully failed to warn the investing public of several key facts that indicated that the company could not meet the

7

guidance set forth on October 25, 2004. Specifically, plaintiffs argue that the defendants knew but failed to disclose that the acceleration of the company's Early Buy Program in late 2004 had cost the company a significant number of sales that had been expected for 2005. In an attempt to rectify the situation and ensure sufficient additional revenue in the first quarter of 2005, the company announced that the price of products shipped after the first quarter would increase 5%. According to Confidential Witness 2 ("CW-2"), the price increase created significant ill will toward Trex among its distributors. As a result, the plaintiffs allege that by March 2005, the defendants knew that the company could not meet its projected sales goals for 2005.

The plaintiffs also allege that defendants failed to adequately apprise the public of the company's declining market share and declining sales that resulted from, among other things, numerous problems the company was having with its distributors and customers. The plaintiffs argue that the defendants affirmatively misrepresented the success of their distribution contract with Home Depot stores. They also aver that the defendants failed to apprise investors that the company's efforts to offset the dramatic increase in the costs of raw materials and the increased costs of production were largely unsuccessful. Additionally, the plaintiffs assert that the defendants understated the extent of the increased price pressures. Specifically, the plaintiffs cite evidence that the defendants knowingly misrepresented the cost of raw materials from one of the company's key suppliers to an analyst during an earnings call on February 18, 2005. The plaintiffs claim that the defendants knew of all of these developments and failed to warn investors before the company revised its 2005 guidance on June 22, 2005.

In contrast to the press releases, filings, and on-the-record discussions with analysts made by Trex, the plaintiffs present evidence from five confidential witnesses who worked for Trex to

8

show that the individual defendants had knowledge that contradicted what they were presenting publicly. Confidential Witness 1 ("CW-1") worked in Trex's Winchester, Virginia headquarters. From July 2004 until "the spring of 2005," CW-1 reported to Pifer, Trex's Senior Vice President of Sales and Marketing, who reported directly to Matheny. CW-1 worked on new product development and testing existing products. CW-1 states that, during the period, the company was beset with quality control problems, difficulties in production of the Brazilia line, declining market share, and problems with distributors. Ultimately, CW-1 alleges that by March 2005, Matheny and Fletcher knew that Trex would be unable to meet its guidance.

CW-2 was a member of Trex's upper management from the fall of 2003 until "early 2005." CW-2's team was responsible for implementing the Early Buy Program during the class period. CW-2 opines that Matheny and Fletcher were motivated to use the program to ensure that Trex would make its 2004 targets, so that they would be rewarded with a 15% profit-sharing incentive. CW-2 further states that Matheny and Fletcher maneuvered sales in the first quarter of 2005 by announcing a price increase after the quarter. CW-2 claims that they did this to keep Trex's stock price close to $50 per share while they sold their own shares.

CW-2 maintains that due to a number of factors, the company's relationships with its key distributors were in trouble during the class period. According to CW-2, the distributors were particularly upset with the price increase because Trex had guaranteed lower prices in their contracts. Additionally, CW-2 states that the company's distributors were upset that Trex was beginning to market to do-it-yourself customers through Home Depot.

CW-2 counters Trex's statements about its cost-cutting strategies by saying that very little was actually done to cut costs. CW-2 indicates that Trex's plan to deal with the increase was to

9

try to buy used polyethylene and recycled materials. This plan was insufficient, according to CW-2. CW-2 also alleges that Matheny significantly over-represented the extent of the company's agreement with Home Depot stores.

Confidential Witness 3 ("CW-3") worked at Trex from December 2003 through June 2005 as a sales representative in California. CW-3 indicates that Northern California is the largest decking market in the country. CW-3's main responsibilities were to sell products to dealers and lumber yards and work with distributors in getting the products to the dealers. CW-3 states that Trex made deals with two Northern Californian distributors to ship products before the end of 2004. According to CW-3, those two deals caused 2005 Early Buy Program sales to be 40–50% less than 2004 sales.

CW-3 corroborates CW-1's and CW-2's statements that the defendants' actions in late 2004 and early 2005 harmed Trex's relationship with its dealers. CW-3 specifically points to the 2005 price increases, saying that they upset distributors who had committed to buying and advertising Trex products in 2005.

CW-3 also opines, based on numerous homeowner complaints, that some of Trex's difficulties stemmed from quality problems caused by the use of polyethylene. CW-3 relates that polyethylene is an inferior plastic not meant for outdoor use. CW-3 describes the management at Trex as "arrogant."

Confidential Witness 4 ("CW-4") confirms CW-3's statement regarding Trex's quality control problems. According to CW-4, Trex products were plagued with "contamination issues," and the company sent out a number of defective boards. Confidential Witness 5 ("CW-5") also supports these allegations regarding quality control. As shipping coordinator in charge of month-

10

end inventory, CW-5 notes that the boards had significant problems with warping, leading to excessive returns. According to the complaint, however, CW-4 and CW-5 left Trex in December 2003 and June 2004, respectively. Because neither of the witnesses worked for the company during the class period, their input is rendered substantially less meaningful. *See Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000) (The confidential witness must be "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged").

In short, plaintiffs allege that the defendants defrauded investors by issuing misleading projections for 2005 and failing to correct them. Specifically, the plaintiffs present a pattern of subterfuge with regard to Trex's public statements involving failure to adequately and truthfully disclose and discuss the company's:

(1) 2005 guidance figures;

(2) Early Buy Program;

(3) Dealer volume;

(4) Decreasing market share;

(5) Brasilia line of products;

(6) Home Depot agreement; and

(7) Increased costs of raw materials.

## II. STATEMENT OF THE APPLICABLE LAW

### A. The Substantive Law

Section 10(b) of the Act sets forth requirements for private securities fraud actions. The plaintiff must sufficiently allege that the defendant made an untrue statement of material fact or

11

omitted a material fact necessary to prevent its public statements from being misleading. 15

U.S.C. § 78u-4(b)(1). The plaintiff also must show that the defendant did this with a particular

state of mind. § 78u-4(b)(2). The United States Court of Appeals for the Fourth Circuit has

divided the plaintiff's burden under Section 10(b) and Rule 10b-5 into four elements:

> In order to prevail on a § 10(b) and a Rule 10b-5 claim, the plaintiff carries the
> burden of proving: (1) the defendant made a false statement or omission of
> material fact (2) with scienter (3) upon which the plaintiff justifiably relied (4)
> that proximately caused the plaintiff's damages. If a reasonable investor,
> exercising due care, would gather a false impression from a statement, which
> would influence an investment decision, then the statement satisfies the initial
> element of a § 10(b) claim.

*Phillips*, 190 F.3d, 613 (citations omitted). The defendants base their motion to dismiss on the

argument that the plaintiffs fail to meet their burdens on the first and second elements.

### B. Pleading Requirements

### 1. *Federal Rule of Civil Procedure 12(b)(6)–Failure to State a Claim Upon Which Relief May Be Granted*

A defendant's Rule 12(b)(6) motion should not be granted "unless it appears beyond

doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him

to relief." Fed. R. Civ. P. 12(b)(6); *Conley v. Gibson*, 355 U.S. 41, 45–46 (1957). In

determining the sufficiency of a complaint, the court must make all reasonable inferences in

favor of the plaintiff. *In re Microstrategy, Inc. Sec. Litig.*, 115 F.Supp. 2d 620, 627 (E.D.Va.

2000). The Fourth Circuit has explained that a Rule 12(b)(6) motion "tests the sufficiency of a

complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim,

12

or the applicability of defenses." *Republican Party of North Carolina v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992).

## 2. Heightened Pleading Requirements of the Private Securities Reform Act of 1995

The normal deference given to the allegations in the plaintiff's complaint under Rule 12 (b)(6) is circumscribed by the strict pleading requirements of both Federal Rule of Civil Procedure 9(b) and the PSLRA, 15 U.S.C. § 78u-4(b). Both of these require that the plaintiff state allegations against the defendant with particularity. Rule 9 provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Likewise, the PSLRA requires that the plaintiff state with particularity the untrue statements or material omissions the defendant allegedly made, specify why the statement or omission was misleading, and, if the statement was made on information or belief, state with particularity all facts on which the belief was formed. 15 U.S.C. § 78u-4(b)(1). Both Rule 9(b) and the PSLRA also require that the plaintiff plead that the defendant had the necessary scienter for fraud. While Rule 9(b)'s scienter provision allows the plaintiff to aver the required state of mind generally, general averment is insufficient to meet the scienter pleadings requirement under the PSLRA. Instead, the PSLRA requires that "with respect to each act or omission alleged," the plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). The required scienter under the PSLRA is intentional misconduct or recklessness. *Ottman v. Hanger Orthopedic Group, Inc.*, 353 F.3d 338, 344 (4th Cir. 2003).[3]

---

[3]The Fourth Circuit adopted the definition of "recklessness" as "an act 'so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or was so obvious that the defendant must have been aware of it.'"

13

Thus, there is a tension between the benefit given the plaintiff at pleading under Rule 12(b)(6) and both the particularity of facts required for the first two elements of a securities fraud action under the PSLRA and the strong inference required for the scienter allegation. A resolution of this tension with regard to the first and second elements of a PSLRA claim was specifically articulated by the Third Circuit when it stated that a plaintiff "may not benefit from inferences flowing from vague or unspecific allegations — inferences that may arguably have been justified under traditional Rule 12(b)(6) analysis." *In re Rockefeller Ctr. Props. Inc. Sec. Litig.*, 311 F.3d 198, 224 (3d Cir. 2002).

With regard to the pleading requirement for scienter under the PSLRA, the Fourth Circuit stated succinctly that the PSLRA "indisputably seeks to make pleading scienter more difficult for plaintiffs." *Phillips v. LCI Int'l, Inc.*, 90 F.3d 609, 620 (4th Cir.1999). Likewise, in *In re Kindred Healthcare, Inc. Sec. Litig.*, 299 F.Supp. 2d 724 (W.D.Ky. 2004), the Court found that PSLRA's strong inference requirement "means that plaintiffs are entitled only to the *most plausible* of competing inferences." *Kindred Healthcare, Inc. Sec. Litig.*, 299 F.Supp. 2d at 729 (emphasis in the original). In *Gompper v. Visx, Inc.*, 298 F.3d 893 (9th Cir. 2002), the Ninth Circuit refused to accept the position that the plaintiffs' complaint should survive a Rule 12(b)(6) motion where they had facts sufficient only to give rise to a reasonable and warranted inference of scienter. *Gompper v. Visx, Inc.*, 298 F.3d 893, 896 (9th Cir. 2002). The Court in *Gompper* made its finding "in light of Congress's more forceful mandate that a complaint in a securities fraud action must simply state more in order to prevail." *Id.* The Court concluded saying, "when determining

---

*Phillips v. LCI Int'l*, 190 F.3d 609, 621 (4th Cir. 1999) (quoting *Hoffman v. Estabrook & Co., Inc.*, 587 F.2d 509, 517 (1st Cir. 1978)).

14

whether plaintiffs have shown a strong inference of scienter, the court must consider *all* reasonable inferences to be drawn from the allegations, including inference unfavorable to the plaintiffs." *Id.* at 897 (emphasis in original).

## III. ANALYSIS

### A. OVERVIEW

The plaintiffs frame their complaint around the contention that a number of facts known to the defendants during the class period rendered Trex's optimistic projections for 2005 and the reaffirmations of those projections materially false. The plaintiffs attempt to demonstrate the material falsity of those projections with evidence, provided primarily by confidential witnesses within the company, to show the defendants knew that the company was in trouble.

Most of the plaintiffs' claims fail primarily because the optimistic statements made by the defendants are not material under Fourth Circuit jurisprudence or the safe harbor provisions of the PSLRA. 15 U.S.C. §78u-5. For a statement to be material, it must be demonstrably false. For an omission to be material, it must render previous material statements misleading. Projections of future growth are rarely material.

The plaintiffs assert that their complaint is grounded on the fact that difficulties within the company rendered Trex's rosy projections of growth in 2005 unattainable. The plaintiffs allege that the company's failure to disclose its difficulties constituted material omissions because they made the company's projections misleading. Most of the plaintiffs' allegations are not actionable because they rest on the defendants' optimistic statements of future growth, which are not material.

15

Second, the plaintiffs' claims of falsity are premised on contrasts between what the defendants stated publicly and what was known privately. The plaintiffs base their allegations of what the defendants knew on information and belief provided by company insiders, now acting as confidential witnesses. Before considering allegations based on information and belief of confidential witnesses, the court must consider the reliability of that information. A confidential witness' testimony can be used in pleading under the PSLRA so long as the testimony involves facts of which the witness had personal knowledge. Because the confidential witness must have personal knowledge, the testimony cannot be based on hearsay. *See Zucco Partners v. Digimarc Corp.*, 2006 WL 2252557 (D. Or. 2006) (declining to consider the allegations of several confidential witness whose statements were based on hearsay because they failed to meet the personal knowledge requirement). Also, the plaintiffs must sufficiently allege that the confidential witness was in a position to know the facts related. *See Novak*, 216 F.3d, 314 (The confidential witness must be "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.").

The court concludes that some of the information provided by the confidential witnesses to support the elements of materiality and scienter does not meet the reliability test set forth in *Novak* because the plaintiffs do not sufficiently allege that the confidential witnesses were in a position to personally know the information they conveyed. Specifically, as discussed above, the court believes that because the complaint indicates that neither CW-4 nor CW-5 worked for Trex during the relevant class period, the information provided by those witnesses lacks reliability. The court also finds that information related by Dwayne Hart and Mark DeMarco to CW-1 is

16

unreliable hearsay. Other statements made by CW-1, CW-2, and CW-3 are based on speculation and opinion and do not provide the information and belief necessary to support pleadings under the PSLRA.

With regard to the second element, scienter, the plaintiffs argue in part that the defendants were motivated to conceal the company's difficulties because they wanted to meet 2004 year-end projections and be rewarded with a 15% profit-sharing bonus, and because they wanted to keep share prices high throughout the period while they sold their individual holdings. To the extent such claims are bolstered by the allegations of CW-2, the court finds that such assertions are based on speculation and do not add to the analysis. Likewise, with regard to the allegations of improper insider sales activity, the plaintiffs' information regarding Matheny's and Fletcher's individual stock sales does not support their claims. The plaintiffs also fail to sufficiently allege scienter because the defendants' acts on which the claim is based can just as easily be interpreted as those of company executives who are working to maintain a positive outlook while trying numerous strategies to enhance their company's market position.

## B. MATERIALITY

To survive this motion to dismiss, the plaintiffs must first provide sufficient allegations that the defendants made false statements or omissions of material fact. *Phillips*, 190 F.3d, 613. The United States Court of Appeals for the Fourth Circuit has cautioned as to the use of the term "material misrepresentation" in the securities fraud context, noting that "material" in 15 U.S.C. § 78u-4(b)(1) modifies "fact" and not "misrepresentation." *Greenhouse v. MCG Capital Corp.*, 392 F.3d 650, 656 (4th Cir. 2004). The materiality of the fact or omission can be determined by

17

the court on a motion to dismiss so long as "no reasonable jury could find it substantially likely that a reasonable investor would find the fact at issue material in the 'total mix' of information." *Id.* at 657. In *Greenhouse*, the Court held that the corporation's public misrepresentations about its Chief Executive Officer's educational background were immaterial. *Id.* at 658. Likewise, in *Longman v. Food Lion, Inc.*, 197 F.3d 675 (4th Cir. 1999), the Court found that the corporation's failure to disclose widespread violations in federal labor laws and pervasive, unsanitary food handling practices were not material. *Longman*, 197 F.3d at 685–86. The Court ruled that the factual issue of the company's violations of federal labor laws was immaterial because the allegations against the company were public before the plaintiffs' harm occurred. *Id.* at 684. Similarly, the Court found that the plaintiff's allegation that the company failed to disclose unsanitary food handling practices was immaterial because the plaintiffs had not shown with sufficient particularity that the company was guilty of widespread unsanitary food handling. *Id.* at 685. Without sufficient allegations from the plaintiff that the alleged unsanitary practices were widespread, the Court found that the company had no duty to disclose occasional sanitation problems that arose in its stores. The omission of such information was found to be immaterial. *Id.* at 686.

On few occasions, courts have found omissions of material facts to be actionable. In *Gebhardt v. ConAgra Foods, Inc.*, 225 F.3d 824 (8th Cir. 2003), the Court held that the company misrepresented material fact by failing to disclose violations of generally accepted accounting procedures and overstatements of earnings. *Id.* at 830. The Fourth Circuit in *Greenhouse* distinguished *Gebhardt*, saying "[T]he key difference, however, is that the fact misrepresented in *Gebhardt*— the company's earnings — might plausibly alter the total mix of information to a

18

reasonable investor." *Greenhouse*, 392 F.3d, 659. This court therefore must analyze the allegations of the plaintiffs' complaint to determine whether the facts allegedly misstated or omitted would have, had they been known to a reasonable investor, influenced the investment decision. *See Phillips*, 190 F.3d, 613.

## 1.     *Trex's 2005 Guidance Figures*

As the plaintiffs acknowledge, the gravamen of their complaint is that the defendants' 2005 guidance figures, issued first on October 25, 2004 and reaffirmed on February 18, 2005, April 7, 2005, and April 27, 2005, were "irresponsibly optimistic and utterly unattainable" and were therefore materially false. (Plaintiffs' Memorandum of Law in Opposition to the Defendants' Motion to Dismiss 35; Complaint ¶5). The plaintiffs support this allegation by showing the disconnect between those rosy guidance figures and the facts known to the individual defendants at that time. The plaintiffs claim, based on information and belief provided by confidential witnesses within the company, that a combination of negative factors known to the defendants alerted the defendants by early 2005 that the company would not meet its 2005 guidance. Specifically, plaintiffs claim that the defendants knew Trex could not meet its 2005 guidance because, by January 2005, the company's orders had fallen off such that they were significantly off-track for the first quarter. In addition, the company knew that most of its distributors were stocked to capacity and would not reorder until June 2005, such that sales in the first half of the year would not be sufficient to catch up. Finally, the company knew that the price of polyethylene from one of the company's largest suppliers had increased by nearly 15%. Rather than warn investors and revise the guidance, the plaintiffs claim that the defendants

19

recklessly continued to reiterate their confidence in the 2005 projections while privately selling their own stock.

Trex released its 2005 guidance in an October 25, 2004 press release. In that release, Matheny said, "[l]ooking forward to 2005, we expect to grow both revenue and earnings in the range of 20–25% for the year." Complaint ¶101. Matheny first reaffirmed the guidance during a February 18, 2005 earnings call in which he said with more particularity:

> Our revenue forecast for 2005 is between $300 and $310 million, falling in line with our previous guidance last October. ... Income for the year we forecast to range between 33 and $34 million, or on an earnings per share basis, $2.16 to $2.23. This guidance is also consistent with our guidance several months ago.

Complaint ¶111. The message was the same in the April 7, 2005 press release: "The company reaffirmed its previously announced guidance for full year 2005, which calls for net sales to range from $300 million to $310 million and earnings per diluted share to range from $2.16 to $2.23." Complaint ¶121. The company's projections for revenue and earnings had dropped, although not significantly, by April 28, 2005, when Matheny said "we reiterate our prior guidance for growth in revenue and earnings to be in the range of 18% to 22%."[4]

In addressing whether the plaintiffs met their heightened burden of pleading based on these statements, the court must first determine whether the company's guidance figures are factual statements that are demonstrably false. *Longman v. Food Lion*, 197 F.3d 675, 682 (4th Cir. 1999) (*citing Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1091–96 (1991)). The

---

[4]In contrast, on June 22, 2005, Trex revised its 2005 guidance, reducing its expected net sales for the year from $300 to $310 million to $270 to $280 million. Complaint ¶136.

court concludes that they are not. Because the defendants' statements are projections of future performance not contingent on specific stated supporting facts, and made without guarantee, holdings in this circuit and the safe harbor provision of the PSLRA, 15 U.S.C. §78u-5, compel this court to conclude that the statements are not actionable.

In a series of cases in the early 1990s, before the enactment of the safe harbor doctrine of 15 U.S.C. § 78u-5, the Fourth Circuit established the rule that an action could be maintained based on a defendant's optimistic projections of future performance in very few circumstances. The Fourth Circuit based its reasoning in this line of cases in part on what was seen as a clear distinction between statements of known facts and prognostications of performance:

> Misstatements or omissions regarding actual *past* or *present* facts are far more likely to be actionable than statements regarding projections of *future* performance. Generally the latter will be deemed actionable under § 10(b) and Rule 10b-5 only if they are supported by specific statements of fact or are worded as guarantees.

*Malone v. Microdyne Corp.*, 26 F.3d 471, 479 (4th 1994) (emphasis in original). The Court in *Raab v. General Physics Corp*, 4 F.3d 286 (4th Cir. 1993), generally characterized non-actionable projections as "soft" and "puffing," saying that they "lack materiality because the market price of a share is not inflated by vague statements predicting growth." *Raab*, 4 F.3d at 289. The Court further explained its reasoning as follows:

> Predictions of future growth stand on a different footing, however, because they will almost always prove to be wrong in hindsight. If a company predicts twenty-five percent growth, that is simply the company's best guess as to how the future will play out. ... If growth proves less than predicted, buyers will sue; if growth proves greater, sellers will sue. Imposing liability would put companies in a whipsaw, with a lawsuit almost a certainty. Such liability would deter companies from discussing their prospects, and the securities markets would be deprived of the information those predictions offer. We believe that is contrary to the goal of full disclosure underlying the securities laws, and we decline to endorse it.

*Raab v. General Physics Corp*, 4 F.3d at 290.

21

The first case in the Fourth Circuit's later line of cases involving forward-looking statements, *Cooke v. Manufactured Homes, Inc.*, 998 F.2d 1256 (4th Cir. 1993), further refines the court's jurisprudence by providing an example of a forward-looking statement that the Court found to be actionable. In *Cooke*, the Court considered whether the district court's grant of the defendants' motion for summary judgment was improper and found that it was, for the period of time before the market was apprised of the defendant's financial difficulties.[5] *Id.* at 1261. The Court determined that before that date, the total mix of information available to investors was contradictory and materially misleading because of specific representations made by the defendants. *Id.* at 1262. The Court pointed specifically to two alleged misstatements made by the defendants. The company had stated publicly that it was negotiating a profitable contract with an insurer that would act as a guarantor for the company's loans and that the company intended to repurchase 400,000 shares of its own stock because the shares were "an attractive investment in light of the Company's strong earnings prospects for the future." *Id.* The Court found that during the relevant period, the conflicting public information — the optimistic statements of expected growth bolstered by those two specific factual statements, contrasted with declining revenues and earnings, increased costs, and local and national articles on the company's financial distress— "gave rise to different interpretations as to whether the representations and/or omissions made by [the defendants] were materially misleading to the market." *Id.* at 1262. The Court therefore determined that there was a genuine issue of material fact and summary judgement was improper. *Id.*

---

[5] In *Cooke*, the district court had determined as a matter of law that the market was fully apprised of the defendant's financial problems as of December 17, 1988. *Id.* at 1259.

22

The Court in *Raab* contrasted the immaterial puffery of the statements "regulatory changes...have created a marketplace for [one of the company's divisions] with an expected annual growth rate of 10% to 30% over the next several years" and "[that division] is poised to carry the growth and success of 1991 well into the future," with the statements made by the defendants in *Cooke*. *Raab*, 4 F.3d at 289. The Court in *Raab* noted that the *Cooke* panel "decided that the likelihood of a misleading representation was greater in such circumstances than in a case where soft forecasting was all that was involved." *Id.* at n.1. The Court also noted that, because of the posture of the *Cooke* case, the panel did not address whether soft, puffing statements were actionable in themselves. *Id.*

In the instant case, the plaintiffs do not argue at any point in the complaint that the guidance issued by Trex was worded as a guarantee. In the initial guidance, the defendant Matheny clearly stated that he "expect[ed]" 20–25% revenue and earnings growth. In all three of the reaffirmations of the guidance, Matheny discussed current company conditions as being in line with the October 2004 guidance, such that the company continued to expect that level of revenue and earnings growth. Expectations and continued expectations are not guarantees. They are therefore not material because no reasonable investor would base his or her investment decisions on such "soft" and "puffing" statements of company well-being and projected growth. *See Raab*, 4 F.3d 286 at 289.

Further, the plaintiffs do not specifically point to omissions of facts that could make Trex's projections actionable as materially false statements. The plaintiffs argue, in essence, that given the above-mentioned factors indicating that the business was ailing, the defendants had an affirmative duty to correct their optimistic projections. A duty to speak arises only in the case of

23

financial projections in which a failure to make a full disclosure would lead to misleading projections. *See Walker v. Action Indus.*, 802 F.3d 703, 710 (4th Cir. 1986) (cert. denied, 479 U.S. 1065 (1987)). The analysis is somewhat circular when the plaintiffs claim that an omission renders an affirmative statement misleading. Even if there is a duty to disclose because of the possibility of resting on misleading projections, the omission is only actionable if the underlying affirmative statements are material. *Id.* at 706. The allegedly omitted facts in this case — the company's problems with the Early Buy Program, its declining market share, its dissatisfied customers and distributors, quality problems with its products, and the increased cost of raw materials — do not bring materiality to the company's "puffing" statements of revenue and earnings growth under the standards set forth by the Fourth Circuit. *See Raab*, 4 F.3d at 289 (finding that the defendants did not have a duty to disclose a slump in contracting and its potential effects on the validity of the company's projected growth statements).

## 2. *The Early Buy Program*

The plaintiffs make two claims regarding the company's 2004–05 Early Buy Program. First, they assert that the company's statements regarding the success of the Early Buy Program were materially false. They contend that, based on information and belief provided by confidential witnesses within the company, the defendants knew at the time the statements were made that the Early Buy Program, as it was conducted in late 2004 and early 2005, caused the company to face a significant shortfall in orders for the first two quarters of 2005 and had upset many of the company's distributors. The plaintiffs point to several occasions when the defendants touted the Early Buy Program to investors and analysts during a time when the defendants were aware of the program's problems. In its April 27, 2005 press release, the

24

company stated that it was "pleased with the performance of [its] marketing and 'early buy' programs." Complaint ¶129. On the following day, Fletcher stated more directly that the company's "2005 Early Buy Program ha[d] been very successful in positioning Trex for a strong year." *Id.* The plaintiffs argue that these statements were materially false based on information about the Early Buy Program provided by CW-1, CW-2, and CW-3. Regardless of the difficulties and failures of the company's 2004–05 Early Buy Program, the defendants' statements lack the specificity required to be considered material.

In the press release, the defendants merely stated that they were pleased with the performance of the program. A statement of opinion can be actionable under the PSLRA only if it is both false and factual. *See Longman v. Food Lion, Inc.*, 197 F.3d 675, 683 (4th Cir. 1999) (citing *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083 (1991)). The statement that the company was "pleased with" the Early Buy Program is neither false nor factual. Fletcher's follow-up statement that the program had put the company on track for a strong year is not actionable because it is mere non-specific puffing. The statement is even less specific than the prediction in *Raab* that the company expected annual growth of "10% to 30% over the next several years," a statement the Fourth Circuit found to be so indefinite in time and scope as to be immaterial. *Raab*, 4 F.3d at 289.

The plaintiffs' second claim regarding the Early Buy Program is that the defendants' failure to apprise analysts and investors of the acceleration of the program into the fourth quarter of 2004 and the negative fallout from that decision constituted a material omission. This is similar to the channel stuffing allegations rejected by this court (Wilson, C.J.) in the first Trex

25

litigation. *In re Trex Co. Sec. Litig.*, 212 F.Supp. 2d 596 (W.D. Va. 2002). In that case, the court

noted that there could be no basis for securities fraud where:

> [P]laintiffs offer only conclusory allegations that defendants' sales practices at the
> beginning of the class period materially inflated revenues in the fourth quarter ... and
> depressed them in the first half of [the following year]. They have not identified even
> one particular transaction involved in defendants' alleged channel stuffing activities,
> nor provided the court with the amount or percentage of revenues those transactions
> generated.

*Id.* at 611. Here, as the defendants point out, the plaintiffs failed to plead with particularity the

way in which the acceleration of the Early Buy Program impacted the company. *Id.* ("Courts

require significant specificity when a plaintiff bases a claim on allegations of channel stuffing or

other misleading revenue recognition."). As the defendants assert, the complaint fails to identify

any orders that were allegedly pulled from 2005 into 2004 and does not allege the amount by

which the acceleration of the Early Buy Program caused the 2005 results to fall below projection.

The plaintiffs attempt to counteract this problem by offering the statement of CW-3 that

"in December 2004, the Company made two large deals with two Northern Californian

distributors–Capital and Orpack–to ship product before year-end." However, even this more

specific allegation fails because CW-3 offers no quantification of these "large" deals, and the

plaintiffs submit no further explanation as to how these particular deals affected the veracity of

the defendants' statements. The court finds that the plaintiffs have failed to plead with

particularity the impact of the accelerated Early Buy Program on the company. The court

therefore will not assess whether any statements made regarding earnings impacted by the Early

Buy Program are demonstrably true or false. *See Longman v. Food Lion, Inc.*, 197 F.3d 675, 682

(4th Cir.1999).

26

Moreover, as a more practical matter, from the standpoint of a reasonable investor, Trex's use of the Early Buy Program was not a secret. While it may be true that Trex used the Early Buy Program differently in 2004–05 than in earlier years, the plaintiffs fail to demonstrate how this difference could impact investment decisions. The company's numerous public acknowledgments of its use of incentives to shift sales, combined with the inherent seasonality of its business and the fact that the company had been involved in channel stuffing litigation two years earlier, are sufficient to have put any reasonable investor on notice that the company's quarterly sales were affected in some measure by a manipulation of its market.

## 3. *Dealer Volume*

The complaint alleges that, given the factors stated by the confidential witnesses to be known to the defendants, the defendants' positive, public statements regarding the company's relationship with its distributors were materially false. The plaintiff's first claim is based on the company's October 25, 2004 press release, which stated that the company was encouraged about its new distribution relationship with Home Depot and that "the general market awareness the Home Depot program creates for Trex is growing independent dealer volume as well." The plaintiffs claim that this statement was materially false based on CW-2's statement that the Home Depot agreement had actually alienated the company's independent contractor distributors and resulted in lower sales of Trex products through those dealers. The plaintiff's claim, however, fails to state with particularity what is materially false about the statement in the press release. The confidential witness's statement that dealers were alienated is as general as the defendants' statement that independent dealer volume was growing. Neither is demonstrably true or false in this case. CW-2 at no point identifies any distributors that left Trex because of dissatisfaction

27

with the Home Depot agreement. Moreover, CW-2 does not state any basis for his supposition that Matheny knew of the independent dealer's dissatisfaction with the Home Depot arrangement. The statements therefore do not meet the particularity requirement of PSLRA and are not actionable.

### 4. Decreased Market Share

The plaintiffs argue that a number of statements by Trex, in which the company bragged about its market share and demand for its products, were false based on information and belief and on the company's own statements showing that its share of the non-wood decking industry was shrinking. Specifically, the plaintiffs point to the company's December 16, 2004 announcement of a new production facility, which the company said would "provide the additional capacity ... needed to fulfill customers' growing demand for Trex's decking and railing products" and the company's claims in its 2004 10-K filing, released on March 16, 2005, that it "had a leading market share of the wood/plastic composite segment of the decking and railing market" and had "again delivered outstanding financial results and expanded [its] position as the market leader in composite decking." The court again finds that these statements are immaterial and notes that the plaintiff does not attempt to cite any information to show that the statements are demonstrably false. *See Longman*, 197 F.3d at 682.

The immateriality of these statements is first shown by examining them in light of a number other Trex statements in the plaintiffs' complaint that provide a more complete view of the company's place in the market. *See Phillips*, 190 F.3d, 615 (noting that "allegedly fraudulent corporate statements must be examined in light of the 'total mix' of information available to

28

investors") (citation omitted). During Matheny's February 18, 2005 earnings call, an analyst suggested that the company's market share was between 40% and 50%, to which Matheny replied, "our number last year was a little bit less than that. It was 35 to 40 percent. I'm more comfortable with our number. Our goal is to get it to where you ascribe it to be, but I think our feeling is somewhere between 35 and 45 percent." Likewise, in the April 27, 2005 press release, the company stated: "As the market for composite decking continues to expand, we believe Trex company is better positioned than ever to define our category." Finally, an examination of four of the 2000–2004 10-K year-end reports, quoted by the plaintiffs in their complaint, shows that the company clearly divulged its declining market share in its SEC filings. A reasonable investor would construe the company's positive statements regarding its market share made in December and March with the information provided in the previous five years' annual filings and the company's February and April statements. Such an investor would come to a more complete understanding of the company's position than that suggested by the plaintiffs.

Even absent the context of the total mix of information the company provided, the statements relied upon by the plaintiffs are too non-specific to be demonstrably false and, therefore, cannot be considered material. The plaintiffs cannot present evidence sufficient to prove that the company did not have a growing demand for its products, that it did not have a leading market share, or that it had not expanded its position as a market leader. These statements are too generalized to be demonstrably false. The plaintiffs base their assertion on statements from a confidential witness, that the company knew that its market share had been declining since 2001, which the company's annual 10-K filings show. The logical problem with the plaintiffs' argument in this regard is that the defendants' positive statements do not exclude

29

the possibility that the company's market share was declining. It is entirely possible that Trex remained a leader in the industry with a line of products that were in increasing demand even at a time when its market share was shrinking.

### 5.    *The Brasilia Line of Products*

The plaintiffs also allege that, despite significant production and quality control difficulties with its new high-end line of non-wood decking, Brasilia, Trex made two positive statements about the line that were materially false. Matheny stated in the February earnings call that Brasilia would account for between 10% and 15% of the company's "mix" for 2005. Matheny then stated in the April earnings call that "Brasilia's introduction continues to exceed our expectations, and should prove to contribute strongly to this year's performance."

The first statement, that Matheny expected Brasilia to account for between 10% and 15% of the company's 2005 "mix," is a future projection not worded as a guarantee, and fails for the reasons discussed in regard to future projections. The statements that the new line exceeded Matheny's expectations and would likely prove to contribute strongly to the year's performance constitute immaterial and non-actionable puffing because such vague optimistic statements are not the kind that inflate the market price of shares. *See Raab*, 4 F.3d at 289.

### 6.    *The Home Depot Agreement*

The plaintiffs allege that the defendants affirmatively misrepresented the number of Home Depot stores that would stock Trex's products in 2005. Plaintiffs base this allegation on statements made by Matheny during earnings calls on October 26, 2004, February 18, 2005, and

30

April 28, 2005. In the court's view, Matheny's statements regarding the level of Home Depot involvement with Trex in 2005 give rise to the closest legal issue in this case.

During the October earnings call, Matheny stated that the company's 2005 guidance figures incorporated a "modest expansion" of distribution to "several hundred more" Home Depot stores. Matheny also stated during this call that, at that time, Trex products were in 120–124 Home Depot stores. Three-and-a-half months later, during the February earnings call, Matheny stated more specifically that the company's "plans going forward call[ed] for expansion to additional markets, rolling out in-store inventory to between 300 and 400 [Home Depot] stores." Matheny reiterated that statement during the April earnings call, saying, "we are in the process of rolling out into another 200 to 300 [Home Depot stores], for a total of somewhere between 300 and 400 stores." In contrast, the plaintiffs present information provided by CW-2, who states that Matheny knew that Home Depot was only going to stock product in 150 stores. It is clear that of all of the statements of which the plaintiffs complain, Matheny's April 2005 earnings call comes closest to stating an existing fact.

At the outset, the court notes that there are substantial questions as to whether CW-2 was employed at Trex on April 28, 2005. The plaintiffs' complaint states that CW-2 left the company in "early 2005." A confidential witness's testimony can be relied on for pleading under the PSLRA only if the testimony regards facts of which the witness had personal knowledge. The plaintiff must provide sufficient allegations to support a finding that the confidential witness was in a position to know the facts related. *See Novak*, 216 F.3d, 314 (The confidential witness must be "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged."). A

31

confidential witness's testimony cannot be based on hearsay. *See Zucco Partners*, 2006 WL

2252557 (declining to consider the allegations of several confidential witnesses whose

statements were based on hearsay because they failed to meet the personal knowledge

requirement). The court's responsibility in determining whether the confidential witness'

allegations are based on first-hand knowledge was recently explained as follows:

> To evaluate whether a confidential source is relaying first-hand knowledge or merely
> speculating, the court examines 'the level of the detail provided by the confidential
> sources, the corroborative nature or the other facts alleged (including from other
> sources), the coherence and plausibility of the allegations, the number of sources, the
> reliability of the sources, and similar indicia.

*In re Cree, Inc. Sec. Litig.*, 333 F. Supp. 2d 461, 472 (M.D. N.C. 2004) (quoting *In re Cabletron*

*Sys, Inc.*, 311 F.2d 11, 29-30 (1st Cir. 2002)).

Under the standards set forth for confidential witnesses in PSLRA pleadings, the court

finds that the plaintiffs allege enough information about CW-2 to allow the court to presume that

CW-2 was in a position to know details of Trex's distribution agreement with Home Depot while

he or she was working for the company. Less certain, however, is whether CW-2 had any

personal knowledge as to what Matheny did or did not know about the scope of the Trex–Home

Depot agreement at the time of the April earnings call. The plaintiff avers that CW-2 was a

member of Trex's upper management from the fall of 2003 until early 2005. CW-2 reported

directly to Pifer, Trex's Senior Vice President of Sales and Marketing, and Monahan, the

Company's Executive Vice President and General Manager, both of whom reported directly to

Matheny. CW-2 managed field sales and communicated with distributors in the United States

and Canada. However, the court finds that it does not need to factually determine whether CW-2

32

was in a position to know the extent of Home Depot's contractual commitments with Trex during the spring of 2005, because, even if CW-2 had been employed by Trex on April 28, 2005, the plaintiffs have failed to allege sufficient facts to support any allegation that Matheny misrepresented a material fact.

The materiality analysis requires that Trex's public statements about the Home Depot contracts must be viewed in light of the "total mix" of information available to investors. *Phillips*, 190 F.3d, 615. A reasonable investor is charged with knowledge of all public statements made about Home Depot during the class period.

During the first earnings call in October 2004, Matheny and Fletcher explained that the Home Depot deal was in its early stages and its extent was not yet known. The defendants acknowledged at that time that they were still negotiating with Home Depot and that they hoped to expand the program across the country. The company also stated that its 2005 projections had incorporated "a modest expansion" into "several hundred more stores." In February, the defendants optimistically referred to Trex's expansion into an additional 200 to 300 Home Depot stores as "plans going forward." The statements made in these two calls are not material because they are future projections not bolstered by specific facts or guarantees. *See Malone*, 26 F.3d at 479.

Matheny's statements two months later, on April 28, 2005, are more specific and require further analysis. During that earnings call, Matheny noted that the company had "re-outfitted the 130 or 140 stores" that carried Trex products at the time, and that it was "in the process of rolling out into another 200 to 300, for a total of somewhere between 300 and 400 stores." By way of

33

contrast, the plaintiffs present the company's guidance revision issued two months later when Trex acknowledged that "[a] slower than expected expansion of our new distribution program with The Home Depot" had caused the company's second-quarter sales to be less than expected. The plaintiffs characterize this revision as a disclosure that the expansion into 300 to 400 Home Depot stores had not materialized.

While on its face, Matheny's April 28th statement is one of present fact rather than an immaterial projection, the statement must be read in light of the "total mix" of information available to investors. The "total mix" of information available to a reasonable investor demonstrated that Trex was working to ensure that the Home Depot deal was successful, but that it required substantial negotiations, as well as "re-outfitting" Home Depot stores. Taken in that light, the success of the expansion of the Home Depot agreement as of April 28th was far from certain. Stated differently, Matheny's comments could not possibly be understood to indicate that Trex products were currently on the shelves of "between 300 and 400 [Home Depot] stores." Matheny's statement on that day about being "in the process of rolling out" into additional Home Depot stores could not have been enough to convince a reasonable investor of the success of the Home Depot expansion.

More importantly, in the final analysis, the court concludes that the plaintiffs do not allege that Matheny knew that his April 28th statement was misleading, nor do they allege sufficient facts to show that Matheny's statements on that day were untrue. The plaintiffs' claim of prevarication rests entirely on CW-2's statement that Matheny knew that the company was only going to stock product in 150 stores. The complaint does not indicate how or when this fact came to be known. For that matter, plaintiffs do not allege that CW-2 had any direct

34

communication with Matheny about the Home Depot contract. Indeed, CW-2 does not provide any basis for his supposition that Matheny knew that the expected agreements had fallen through or, for that matter, even whether efforts to stock other Home Depot stores had fallen through. There is no indication of how many Home Depot stores were under contract on April 28, 2005. Based on the pleadings, the court has no viable basis on which to assess the materiality or the truthfulness of Matheny's statements. Without such particularized allegations, the plaintiffs' claim must fail. *See Novak*, 216 F.3d, 313-14 (noting that plaintiffs must plead "with particularity sufficient facts to support" allegations of false or misleading statements). To permit such a claim to go forward would reward inexactitude.

## 7. *Increased Costs of Raw Materials*

The plaintiffs' final claim of misstatement of material fact turns on the undisputed fact that the company was experiencing increased costs of raw materials. As was true with the Home Depot claim, plaintiffs allege a false statement of present fact.

In its SEC filings, press releases, and earnings calls during the period, the company repeatedly disclosed that the higher cost of raw materials was adversely affecting its gross margins. The company consistently explained that it was using a number of techniques, including increasing prices and relying on alternative raw materials sourcing, to manage its costs. The plaintiffs' claim, however, that during discussions of its projections for 2005, the company affirmatively misrepresented its cost for polyethylene in explaining its gross margins computations. The plaintiffs point to a specific exchange during the February 18th earnings call. On that occasion, the analyst asked about the company's projected gross margin of 40%, and

35

Matheny affirmed that this projection was based on polyethylene pricing at around $0.23 per pound.

According to the plaintiffs, Trex was paying considerably more than $0.23 per pound for polyethylene at the time of the call. CW-2 states that the 2005 budget projections did not account for the dramatic increases in raw materials pricing. According to CW-2, in January 2005, Dow, one of Trex's major suppliers of raw materials, told the company that the price of polyethylene was going to increase by 10% as of February 2005. The February price increase came on the heels of a 5% increase in Dow's price in December 2004. CW-2 asserts that after those price increases, the company was paying $0.50 per pound for "off-grade" polyethylene.

In considering this facial inconsistency, the court again finds it necessary to put Matheny's statement in context. The earnings call of February 18, 2005, was conducted as a follow-up to the company's press release entitled "Trex Company Completes Year of Strong Growth; 2004 Revenue Increases 33%, EPS up 28%." Early in the conversation, while discussing the company's 2004 fourth-quarter gross margin, Matheny acknowledged, "we continue to pay very high prices for polyethylene. This we have seen through January and have forecasted these higher costs in our plans for the year. We continue to work on productivity gains and other means to improve margins but believe substantial gains will only be realized when pricing for poly returns to more historic levels." At that point, Matheny announced that the company was enacting a price increase to offset costs. Matheny stated that the price increase "should bring our gross profit margin to more historical levels during the second quarter and we

36

believe by year end the average gross profit margin for the year will be slightly over 40%."[6] Later in the conversation, the analyst stated "it sounds like the new gross margin guidance or the first gross margin guidance here [is] slightly over 40 percent. Is that assuming poly stays in the $0.23 a pound range?" Matheny replied in the affirmative.

The gross margin guidance itself, like the revenue and earnings projections discussed above, is not actionable because it is a forward-looking statement. The problem lies in the fact that Matheny affirmatively stated that the guidance was based on a specific and particularized cost for one of the company's primary raw materials. The analyst followed up on Matheny's statement by asking him whether he thought the company was going to be able to continue at its gross margin with the "continued inflationary pressure." Matheny responded by saying that he did not expect to be able to drive down the price of polyethylene in the following six months, but that the company had been "kind of conservative...in giving [its] gross margin and guidance...."

Matheny's statement regarding cost, while sufficiently particularized to be a factual statement capable of being demonstrably false, is not shown to be false by the plaintiffs' allegedly contradictory information. CW-2's assertion that one supplier had provided polyethylene at a price higher than the $0.23 per pound figure that Matheny admittedly used in his gross profit margin computation does not support the notion that Matheny's projections as to the profit margin for the entire year were false or materially misleading. CW-2's statement refers to a specific time, namely, the period in February 2005 after Dow had announced its price increase. On the other hand, Matheny's statements about the price the company was paying were

---

[6]According to the company, "[g]ross profit indicates the difference between net sales and cost of sales." Defendants' Exhibit #11, Trex, Form 10-K Trex Co Inc – TWP (filed March 16, 2005).

made in the context of gross margins projections for the entire year. The gross margin

projection, as with any type of year-end projection, required a year-long assessment of costs,

pricing, and materials acquisition. Matheny's cost statement was based on information he

projected regarding pricing for the rest of the year, and not just on what he knew the price to be

on February 18. The plaintiffs fail to provide any information to show that Matheny's statement

was false based on his cost projection for polyethylene and product pricing projections for the

remainder of the year. The court therefore concludes that the plaintiffs have failed to meet their

burden to sufficiently allege that Matheny's statement regarding the price of raw materials was

materially false or misleading when considered in context with his earlier assessments.

### 8.    *Materiality Conclusion*

In summary, the court concludes that plaintiffs have failed to sufficiently allege that the

defendants made untrue statements of material fact or omitted material facts in public statements,

so as to mislead the investing public. The court concludes that, for the most part, the accused

statements and omissions dealt with projections of future performance and cannot be deemed

actionable under § 10B and 10B-5. 15 U.S.C. § 78j(b); Rule 10b-5, 17 C.F.R. § 240.10b-5; *see*

*Malone,* 26 F.3d at 479 (finding that projections of future performance are only actionable if they

are "supported by specific statements of fact or are worded as guarantees").

As for those rare occasions on which plaintiffs allege misrepresentations or omissions as

to present facts, such as the extent of the Trex – Home Depot connection or Trex's cost of raw

materials, the court concludes that a fair reading of the statements in context belies plaintiffs'

conclusory allegations. *See Phillips,* 190 F.3d at 615 (noting that "allegedly fraudulent corporate

statements must be examined in light of the 'total mix' of information available to investors) (citation omitted). It follows that plaintiff's complaint fails under the PSLRA. 15 U.S.C. § 78u-4(b)(1).

## B. SCIENTER

In addition to concluding that the plaintiffs' have failed to adequately allege a material misstatement or omission, the court concludes that the plaintiffs have failed to allege facts that adequately plead scienter. The PSLRA requires that

> the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, [and] the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u-4(b)(2). In *Novak*, the Second Circuit (upon whose prior rulings Congress based its 1995 update of the PSLRA) held that the "strong inference" required in the PSLRA may arise

> where the complaint sufficiently alleges that the defendants: (1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor.

*Id.* at 311 (internal citations omitted), *accord Svezzese v. Duratek, Inc.*, 67 Fed. Appx. 169, 173 (4th Cir. 2003). In this case, the plaintiffs' theory rests on the first and the third elements identified in *Novak*.

The Fourth Circuit eschewed "focusing on specific categories of facts, such as those relating to motive and opportunity," instead stating that courts "should examine all of the allegations in each case to determine whether they collectively establish a strong inference of

39

scienter." *Ottman v. Hanger Orthopedic Group, Inc.*, 353 F.3d 338, 345 (4th Cir. 2003). In an earlier case, however, the Fourth Circuit had specifically acknowledged two ways in which scienter may be pled, saying that "[p]laintiffs can plead scienter by (a) alleging facts demonstrating that defendants had both the motive and the opportunity to commit fraud or (b) otherwise alleging facts to show strong circumstantial evidence of defendants' conscious misbehavior or recklessness." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74 (4th Cir. 2001). The two opinions are not contradictory. Rather, the latter expands the duty of the court when analyzing scienter even when the plaintiffs allege a conventional motive and opportunity theory, as is the case here. Allegations of motive and opportunity, while relevant to the court's inquiry, are not sufficient to establish scienter. *Ottman*, 353 F.3d at 345. The court therefore reviews the totality of the plaintiffs' narrative of the case to determine whether all of the sufficiently particularized facts alleged give rise to a strong inference of scienter.

### The Plaintiffs' Allegations

At the outset, the court notes that any allegation of scienter based on the defendants' alleged knowledge or reckless disregard of the falsity of statements or omissions that the court has herein found to be immaterial must fail as a matter of law. However, the court will analyze the sufficiency of the plaintiffs' scienter pleadings assuming *arguendo* that the plaintiffs have met their burden of showing that the defendants made false statements of material facts or omissions that rendered such statements false. Even assuming that the defendants' statements and omissions were materially misleading, the court concludes that the facts and circumstances alleged by the plaintiffs do not give rise to a viable claim of scienter.

40